**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ENCYCLOPÆDIA BRITANNICA, INC., and
MERRIAM-WEBSTER, INC.,

      Plaintiffs,

      v.

PERPLEXITY AI, INC.,

      Defendant.

Civil Action No. 1:25-cv-7546

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Encyclopædia Britannica, Inc. ("Britannica") and Merriam-Webster, Inc. ("Merriam-Webster" and, collectively with Britannica, "Plaintiffs"), by and through their attorneys, respectfully bring this Amended Complaint against Defendant Perplexity AI, Inc. ("Perplexity" or "Defendant") and allege as follows:

**NATURE OF THE ACTION**

1.     Perplexity is a generative artificial intelligence company that purports to revolutionize Internet search by providing its users with a so-called "answer engine."[1] Rather than providing users with "ten blue links" to websites that may provide users with the information they are searching for, Perplexity claims to do the digging for its users. According to Perplexity, "[w]hen you ask Perplexity a question, it uses advanced AI to search the internet in real-time, gathering insights from top-tier sources. It then distills this information into a clear, concise summary, delivering exactly what you need in an easy-to-understand, conversational tone."[2] By

---

[1] Perplexity, *What is an answer engine, and how does Perplexity work as one?*, https://www.perplexity.ai/help-center/en/articles/10354917-what-is-an-answer-engine-and-how-does-perplexity-work-as-one (last accessed September 9, 2025).

[2] Perplexity, *How does Perplexity work?*, https://www.perplexity.ai/help-center/en/articles/10352895-how-does-perplexity-work (last accessed September 9, 2025).

doing the digging for its users, Perplexity purports to save users' time and energy and eliminate the need for its users themselves to visit the websites from which Perplexity derives its "answers."[3]

2.      Britannica is a household name synonymous with trusted, fact-checked, meticulously researched content. Since its beginnings over 250 years ago as a publisher of hard-copy encyclopedias, it is now a global digital education and information platform that delivers knowledge to students, educators, and learners of all ages with innovative digital instructional and informational solutions.

3.      Britannica also owns Merriam-Webster, Inc., which has been America's leading provider of language information for more than 180 years. Merriam-Webster's websites, apps, and social media channels offer guidance to tens of millions of visitors every month. In print, Merriam-Webster's publications include Merriam-Webster's Collegiate Dictionary, which is among the best-selling books in American history, as well as dictionaries for English-language learners.

4.      With personalized, adaptive instructional solutions and a rich array of articles, videos, photos, interactives, games, and quizzes, Plaintiffs empower people everywhere to learn, explore, and engage. To continue developing the high-quality content for which they have come to be known, Plaintiffs invest in the talent and effort of human researchers, writers, editors, and creators to produce trusted digital content.

5.      There is a high demand for such content. In 2024 alone, Britannica had over one billion sessions at www.britannica.com on the consumer side of its business. This number does

---

[3] Indeed, as recently as August 2024, Perplexity boasted that its "answer engine" allowed users to "Skip the links" by providing "a single, comprehensive answer that summarizes everything you need to know." *See* https://perma.cc/Q4VM-DYUJ (accessed from *Dow Jones & Co., Inc. & NYP Holdings, Inc. v. Perplexity AI, Inc.*, No. 1:24-cv-07984-KPF, at Dkt. 46 n.1 (S.D.N.Y. Jan. 28, 2025)). Perplexity appears to have removed the specific "Skip the links" catchphrase from its promotional material. Nonetheless, the sentiment behind it—Perplexity's obviating users' need to visit the links or the sources of Perplexity's "answers" to their queries—still remains central to Perplexity's value proposition.

not even account for an additional 1.4 billion sessions at other websites maintained by Britannica, including merriam-webster.com. Plaintiffs fund their investment in their content through user subscriptions, as well as advertising revenue that funds the creation of Britannica's and Merriam-Webster's content.

6.    Perplexity's "answer engine" free rides on this investment by cannibalizing traffic to Plaintiffs' websites with AI-generated summaries of Plaintiffs' own content. A traditional search engine takes in users' queries and returns search results that require users to travel to other webpages to explore information responsive to that query. A search result is thus an informational product that connects users to external webpages containing information or content relevant to their queries. Put differently, a search engine is an intermediary between users seeking information and web publishers who provide that information. A search engine thus generates clicks from users who click on search results to visit a web publisher's website. Web publishers like Plaintiffs rely on those clicks to sell subscriptions to users who seek to delve more deeply into some content, as well as selling advertising to third parties who seek to present their products or services before the publishers' users.

7.    Perplexity's so-called "answer engine" eliminates users' clicks on Plaintiffs' and other web publishers' websites—and, in turn, starves web publishers of revenue—by generating responses to users' queries that substitute the content from other information websites. To build its substitute product, Perplexity engages in massive copying of Plaintiffs' and other web publishers' protected content without authorization or remuneration.

8.    Upon information and belief, in its quest to provide "answers" to user queries, Perplexity accesses as much content as it can from Plaintiffs and other original sources of trusted, reliable information. Perplexity then makes copies of that content, feeds the content to its retrieval-

augmented generation or "RAG" model, and repackages the original content in written responses to users. Those responses, or outputs, often are verbatim or near-verbatim reproductions, summaries, or abridgements of the original content, including Plaintiffs' copyrighted works.

9. Perplexity's conduct violates Plaintiffs' exclusive rights under the Copyright Act in at least three ways:

- *First*, Perplexity infringes Plaintiffs' copyrights at the *curation* stage when it uses a software program called "PerplexityBot" to crawl and scrape Plaintiffs' websites for Perplexity's "answer engine."

- *Second*, Perplexity infringes Plaintiffs' copyrights at the *input* stage when it copies Plaintiffs' copyrighted articles that are responsive to user searches to prompt responses from its RAG model.

- *Third*, Perplexity infringes Plaintiffs' copyrights at the *output* stage when its RAG model generates outputs that are substantially similar to those inputs. These responses often contain full or partial verbatim reproductions of Plaintiffs' copyrighted articles. At other times, Perplexity's answers are reworded into text that resembles, paraphrases, or summarizes Plaintiffs' copyrighted works, and/or copies the selection and curation of content and lists in Britannica's copyrighted articles.

10. In addition to its massive copyright infringement, Perplexity also violates Plaintiffs' trademarks under the Lanham Act when its AI products generate made-up content or "hallucinations" and falsely attribute them to Plaintiffs by displaying them alongside Plaintiffs' famous trademarks. Perplexity likewise violates Plaintiffs' trademarks under the Lanham Act when its AI products misleadingly omit portions of Plaintiffs' content without disclosing those

omissions and display the incomplete and inaccurate reproductions alongside Plaintiffs' famous trademarks. In addition, Perplexity's use of Plaintiffs' trademarks constitutes false designations of origin and confuses and deceives Perplexity users into believing that the hallucinations and/or undisclosed omissions are associated with, sponsored by, or approved by Plaintiffs.

11. The law does not permit Perplexity's systematic disregard for the rights and intellectual property of Britannica and Merriam-Webster. By this action, Plaintiffs seek to hold Perplexity responsible for the substantial harm it is causing and illicit profits it is reaping by infringing on Plaintiffs' copyrights and trademarks and to protect the public's continued access to high-quality and trustworthy online information.

## THE PARTIES

12. Plaintiff Encyclopædia Britannica, Inc. is a Delaware corporation with its headquarters and principal place of business at 325 N. LaSalle Street, Suite 200, Chicago, Illinois 60654.

13. Plaintiff Merriam-Webster, Inc. is a Delaware corporation with its headquarters and principal place of business at 47 Federal Street, Springfield, Massachusetts 01105.

14. Defendant Perplexity AI, Inc. ("Perplexity") is a Delaware corporation with its principal place of business at 115 Sansome Street, Suite 900, San Francisco, California 94104.

## JURISDICTION AND VENUE

15. This civil action seeks damages, injunctive relief, and other equitable relief under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, and the Lanham Act, 15 U.S.C. § 1051 *et seq.*

16. This Court has subject matter jurisdiction over this civil action under 28 U.S.C. §§ 1331 and 1338.

5

17.    As set forth in this section and further supported in the "Factual Allegations" below, this Court has personal jurisdiction over Perplexity pursuant to New York Civil Practice Law and Rules § 302(a)(1)–(4) and the Due Process Clause of the U.S. Constitution. In multiple independently sufficient ways, Perplexity has purposely availed itself of the privilege of doing business in the State of New York and subjected itself to New York's long-arm jurisdiction.

18.    Since April 21, 2023, Perplexity has been registered to do business in the State of New York. Perplexity's New York Department of State identification number is 6837808.

19.    Perplexity uses real property situated within this State and District, including office space in Manhattan, which is utilized for the conduct of its business as outlined in this Complaint. Perplexity states on its website that it has "offices in San Francisco and New York City," and that employees "work a hybrid schedule and are in the office Mondays, Wednesdays, and Fridays."[4] On or around February 18, 2025, Perplexity's Work Experience Manager, Tram Anh Phun, submitted a declaration in *Dow Jones & Co., Inc. & NYP Holdings, Inc. v. Perplexity AI, Inc.*, No. 1:24-cv-07984-KPF (S.D.N.Y.) ("*Dow Jones*"), confirming that "Perplexity rents office space from Industrious, a co-working facility, located at 215 Park Avenue South, 11th Floor, New York, New York 10003." *See id.* at Dkt. 49, at ¶ 8. As further described below, this Court recently found Perplexity's office space in New York, in addition to other factors, to weigh in favor of exercising jurisdiction over Perplexity. *See Dow Jones*, Dkt. 65, 2025 WL 2416401 (S.D.N.Y. Aug. 21, 2025).

20.    Perplexity employs a growing number of individuals in this State and District. These New York-based employees include but are not limited to its Co-Founder and Chief Strategy

---

[4] Perplexity, *Help us build the* future *of search*, https://www.perplexity.ai/hub/careers (last accessed September 9, 2025).

Officer; senior business, sales, strategy, finance, and legal staff; engineering and infrastructure staff, as well as staff responsible for content, marketing, and maintaining and improving the customer experience of Perplexity's generative AI website and mobile applications through which it conducts significant business. Job titles and/or descriptions for some of these New York-based employees include Co-Founder and Chief Strategy Officer; Product Marketing Lead; Founding Lead – Enterprise Growth; Head of Consumer Experience; and members of the technical staff, including the product, data science, and software engineering teams.

21.    Perplexity's co-founder and Chief Strategy Officer Johnny Ho has publicly stated how the company benefitted from its presence in New York since its founding. In response to a question about whether "there was something that gave you conviction about these individuals to go on the journey [to found Perplexity] with," Ho stated that his "being in New York brought some different perspectives to the company and allowed us to actually work in an a-sync way where all of us have our own ideas and push them together and find something that will align, hopefully not only with a bubble but, like, the entire world."[5]

22.    In another interview, Ho further revealed how the only in-person meeting among Perplexity's three co-founders in starting the company took place in New York: "We got together, like, one time in New York, and we had a whiteboard, and we spent like maybe two or three days together. And that was, like, pretty much the only time that we had in person. Everything else was just like remote."[6]

---

[5] The Room Podcast, *Empowering The Future of Gen AI with Johnny Ho, Co-Founder of Perplexity* (October 1, 2024), at 10:02-10:45, https://www.youtube.com/watch?v=ZWtcsjQ1gQ4.

[6] Imagination in Action, *Inside Perplexity AI: A Conversation with Johnny Ho, Cofounder of Perplexity and CSO | IIA @ MIT 2025* (Apr. 30, 2025), at 2:55-3:15, https://www.youtube.com/watch?v=4ibfXV5vYaA.

23.     Perplexity actively seeks to expand its presence in New York and take advantage of talent in this State and District. Perplexity's career webpage prominently features that it has offices in  San Francisco and New York City. On September 9, 2025, the website listed at least 38 positions based in New York:

- AI Software Engineer – Discovery
- AI Software Engineer – Personalization Infrastructure
- AI Software Engineer – Agent Platform
- AI Machine Learning Engineer - Personalization
- AI Software Engineer – Data Platform
- AI Infra Engineer
- Tech Lead – Acceleration
- Tech Lead – AI Engagement
- AI Machine Learning Engineer – Query Understanding
- AI Software Engineer – Evaluation Platform
- AI Research/Machine Learning Engineer – Agent Products
- AI Training Infrastructure Engineer – Post Training
- AI Research Scientist – Post Training
- AI Research Engineer – Post Training
- AI Inference Engineer
- Enterprise Growth Marketing Lead
- Enterprise Growth Lead
- Head of Enterprise Ops and Systems
- Brand Web Designer – Framer Expert
- Developer Relations Manager – Sonar
- Full-Stack Engineer – Comet
- Android Engineer – Comet
- Staff Developer Experience Engineer
- Release Engineer
- Customer Success Engineer – API and Enterprise
- Platform Engineering Manager
- Staff Software Engineer – Authentication & Identity
- Staff Backend Software Engineer – Product Platform
- Product QA Tester
- Frontend Software Engineer
- Builder – NYC (General Interest)
- Backend Software Engineer
- Full Stack Software Engineer
- AI Security Engineer
- Anti-Fraud & Abuse Engineer
- Forward-Deployed Engineer – Sonar API

8

- Engineering Manager – Sonar
- Backend Software Engineer – Sonar[7]

24.     These roles have responsibilities directly relevant to the claims in this Complaint. For instance, Perplexity describes the open position for the "AI Software Engineer – Data Platform" as "an experienced Software Engineer focusing on building the next-gen AI Data Platform" who will "help build Perplexity's end-to-end AI data stack and flywheel which powers all AI products, ML use cases and language models."[8] The "AI Machine Learning Engineer – Personalization" position is advertised as "help[ing] build next generation of personalization experience" by "focus[ing] on improving user happiness on Perplexity by making the content highly relevant, personal and inspiring.[9] The "AI Machine Learning Engineer – Query Understanding" position is advertised as helping "build and improve the query understanding systems that power [Perplexity's] next-generation information discovery experience" by "focus[ing] on understanding user intent deeply and accurately, which is foundational to providing relevant, high-quality, and context-aware responses."[10]

25.     As recently as June 2, 2025, Perplexity's career webpage notified prospective employees that all of its open positions "can be based in our SF or NYC office location unless otherwise noted."[11]

---

[7] Perplexity, *Help us build the* future *of search*, https://www.perplexity.ai/hub/careers#open-roles (last accessed September 9, 2025).

[8]     Perplexity, *AI Software Engineer – Data Platform*, https://job-boards.greenhouse.io/perplexityai/jobs/4601389007 (last accessed September 9, 2025).

[9]     Perplexity, *AI Machine Learning Engineer – Personalization,* https://job-boards.greenhouse.io/perplexityai/jobs/4794829007 (last accessed September 9, 2025).

[10] Perplexity, *AI Machine Learning Engineer – Query Understanding,* https://job-boards.greenhouse.io/perplexityai/jobs/4741698007 (last accessed September 9, 2025).

[11]     Wayback     Machine,     *Perplexity     –     Careers*     (crawled     June     2,     2025), https://web.archive.org/web/20250602221549/https://www.perplexity.ai/hub/careers     (last     accessed September 9, 2025).

## Current Openings

Positions can be based in our SF or NYC office location unless otherwise noted.

26.    A recent search on LinkedIn of "People" at Perplexity in New York City yielded at least twenty results of people who publicly described themselves as currently employed at Perplexity in New York. This number excludes dozens of other investors, current and former Business Fellows,[12] and current and former Campus Strategists (or Campus Ambassadors)[13] of Perplexity. Current New York-based employees include software engineers, data scientists, and other members of technical staff;[14] personnel leading product development, marketing, and consumer experience; [15] personnel in charge of growth of the company,[16] and personnel who focus their efforts on integrating Perplexity into specific industries like financial services. [17]

---

[12] Upon information and belief, Perplexity recently launched an AI Business Fellowship "to equip business professionals with skills to implement and lead AI initiatives in their workplace." https://www.linkedin.com/posts/perplexity-ai_perplexity-is-launching-an-ai-business-fellowship-activity-7294772269833166848-pvq9/ (last accessed September 9, 2025). Current and former fellows include numerous business professionals based in New York.

[13] Perplexity has launched a Campus Strategist Program. Through the Program, Perplexity pitches students who are "Passionate about AI" and are "power user[s] of Perplexity" to "Collaborat[e] directly with the Perplexity Growth team" and "Collaborate with other Campus Strategists around the world" https://www.perplexity.ai/campus-strategists (last accessed September 9, 2025). Current and former ambassadors include numerous students based in New York.

[14] *See, e.g.*, https://www.linkedin.com/in/rohinbhasin/; https://www.linkedin.com/in/nikhil-birmiwal-422184ab/; https://www.linkedin.com/in/jamesliounis/; https://www.linkedin.com/in/noahyonack/.

[15] *See, e.g.*, https://www.linkedin.com/in/bhalladhruv/; https://www.linkedin.com/in/buzinover/; https://www.linkedin.com/in/jennytsung/; https://www.linkedin.com/in/daniela-gomez-9680ba263/.

[16] *See, e.g.*, https://www.linkedin.com/in/rohithkolluri/; https://www.linkedin.com/in/aaudino/;

[17] *See, e.g.*, https://www.linkedin.com/in/brookerbelcourt/ ("Working to build the best product & service for anyone who works in financial services.").

27.     Perplexity also specifically targets customers in or visiting New York with material tailored to those interested in New York. Indeed, its webpage https://www.perplexity.ai/encyclopedia/discovernewyork, invites visitors to "Discover New York with Perplexity" and links the following diverse material, the only commonality among which is New York:

- Discover NYC's Top Study Spots: The Ultimate Guide for Students
- New York's Best Coffee Roasters: Where to Find the Perfect Brew
- The Ultimate Guide to New York City's Best Bookstores
- Discover New York's Top Basketball Courts: A Player's Guide
- New York's Best Farmers Markets
- New York's Best Pizza: A Guide to the Top Pizzerias
- Top NYC Escape Rooms You Need to Know
- Top NYC Mexican Restaurants
- NYC's Top Thrift Stores



28.     Upon information and belief, Perplexity derives substantial revenue from its services rendered in this State and District and derives substantial revenue from interstate commerce. As of the first half of 2025, Perplexity has approximately 22 million active users across

its website and app.[18] Upon information and belief, a significant number of these users are located in this State and District. Moreover, upon information and belief, and as evidenced by its business operations in this State and District, Perplexity expects or should reasonably expect its business operations, including its actions alleged to be legal violations in this Complaint, to have consequences in the State and District.

29.     Plaintiffs' claims in this Complaint relate directly to the business that Perplexity transacts in this State and District and to the work of its employees in this State and District who create, design, market, and grow Perplexity's products and services. As alleged further in this Complaint, the answers and other information that Perplexity sells and delivers to its subscribers and users in this State and District are in relevant instances infringements of Plaintiffs' copyrighted works, including because they result from Perplexity making and using unauthorized copies of Plaintiffs' copyrighted works. Moreover, the answers and other information that Perplexity sells and delivers to its subscribers and users in this State and District sometimes contain undisclosed omissions and/or made-up content or "hallucinations" that devalue Plaintiffs' valuable trademarks and causes confusion among customers in this State and District. The business that Perplexity conducts, including its infringement of Plaintiffs' copyrights and trademarks, both within this State and District and elsewhere, directly and foreseeably harms Plaintiffs in this State and District because Plaintiffs have a high concentration of customers in New York City.

30.     Plaintiffs also have connections to this State and District. Britannica leases office space at 420 Lexington Avenue, New York, NY 10170. Britannica also partners with the New York Public Library to provide over 3 million students with access to (1) Britannica Academic

---

[18] David Curry, *Perplexity Revenue and Usage Statistics (2025)*, Business of Apps (May 15, 2025), https://www.businessofapps.com/data/perplexity-ai-statistics/.

(which includes access to Merriam-Webster's Collegiate Dictionary, magazines, and periodicals); (2) Britannica Escolar (which includes thousands of articles, videos, and primary sources in the Spanish language); and (3) Britannica School (which is the go-to source for K-12 students by offering each article at three reading levels to cater to diverse learning needs).

31.    This Court's exercise of jurisdiction over Perplexity is consistent with Due Process for the reasons alleged herein, including but not limited to the fact that Perplexity's business transactions in New York, contacts with New York, injuries to Plaintiffs in New York, and use of real property in New York all relate to Plaintiffs' claims in this Complaint. Perplexity's growing presence in New York, including numerous existing employees and its active recruitment of additional employees, further demonstrates that this Court's exercise of jurisdiction over Perplexity comports with fair play and substantial justice.

32.    This Court has forum over this action because Perplexity is already defending lawsuits filed against it in this State and District. In January 2025, Dow Jones & Company and NYP Holdings filed in this District their second amended complaint against Perplexity alleging copyright and trademark infringement. *See Dow Jones*, No. 24-cv-7984-KPF, Dkt. 46 (S.D.N.Y. Jan. 28, 2025). On August 21, 2025, the *Dow Jones* court denied in full Perplexity's 12(b)(2), 12(b)(3), and (12(b)(6) motion to dismiss the complaint for lack of jurisdiction, improper venue, and failure to state a claim. *Id.*, Dkt. 65, 2025 WL 2416401, at *1 (S.D.N.Y. Aug. 21, 2025). The Court further declined to transfer the case to the Northern District of California. *Id.* In reaching these conclusions, the court recognized Perplexity's "extensive contacts with this state—such as hiring key employees in New York, leasing office space in New York, and targeting New York users with advertisements and New York-specific webpages, coupled with offering an interactive

website and mobile app in New York." *Id.* at *13.  It is proper for this Court to adjudicate this action alleging similar misconduct as in *Dow Jones* within the same forum.

33.     Finally, venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(a). As described above, Perplexity and/or its agents reside in this District and/or may be found in this State and District. In addition, a significant number of Plaintiffs' users are located in this State and District. Lastly, this is the District in which a substantial portion of the events giving rise to the claims occurred and/or in which Plaintiffs' injuries were suffered: As a direct and proximate result of Perplexity's unauthorized use and/or dissemination of Plaintiffs' copyrighted works and trademarks in New York and elsewhere, Plaintiffs have lost and will continue to lose revenue and profits from the markets for advertising, subscribers, visitors, and users.

## FACTUAL ALLEGATIONS

**I.      Plaintiffs' Business, Copyrights, and Trademarks**

34.     For more than 250 years, Britannica has provided dynamic, continuously updated, and rigorously fact-checked information for students, teachers, and lifelong learners. After its founding in Edinburgh, Scotland, in 1768 as a hard-copy encyclopedia, Britannica has rapidly expanded its presence and pivoted to face an increasingly digital world to publish its well-known encyclopedias online. Britannica has undergone different ownership structures over the years. But its commitment to quality has not wavered.

35.     Today, Britannica is a trusted global digital education and information platform that delivers knowledge with innovative global solutions to strengthen student learning outcomes, assist educators, and inform and delight learners of all ages. Britannica has become a household name and provides not only its well-known encyclopedias, now digitally, but also a wide range of curriculum products, language-study courses, and readiness trainings. Britannica's brands include Britannica Education, which delivers instructional solutions that improve classroom outcomes for

14

students and educators around the world; and Plaintiff Merriam-Webster, the United States's leading dictionary and preeminent authority on language and usage.

36.    Over 150 countries and 150 million students worldwide use Britannica's services today. Solidifying its commitment as a global company, Britannica offers its content in over 20 languages and records over seven billion webpage views annually.

37.    Plaintiff Merriam-Webster, Inc. is a publisher of reference books and is most well-known for its publication of America's leading dictionary. Since its founding in 1831, Merriam-Webster has been the preeminent authority on the English language, including through its publication of print and digital dictionaries.

38.    Merriam-Webster remains an authority in teaching the public about the English language, often through its clever and engaging content that uses humor and wordplay to increase its pedagogic value. For instance, Merriam-Webster's Instagram account has over 800,000 followers and is highly praised for its engaging and informative content:



39.     Plaintiffs did not become trusted sources for digital factual and educational content by accident. Plaintiffs employ hundreds of employees—including writers, editors, researchers, and content creators—to generate their original digital content. Plaintiffs rely on the effort, skills, and experience of this human talent to continue publishing their trusted, high-quality content. These staff not only decide *what* stories to tell but also *how* to tell them. They not only uncover facts but also present them in a way that will inspire curiosity and the joy of learning in Plaintiffs' readers and users.

40.     Britannica owns the copyright in at least 13 "collective works," as defined by 17 U.S.C. § 101, encompassing nearly 100,000 online articles, as well as the copyright in the print volumes of the New Encyclopaedia Britannica. The registration certificates applicable to these articles are attached as Exhibits 1-14 to this complaint.

41.    Britannica is also the owner of a number of federally registered trademarks for the name "Britannica," including Registration Nos. 1,309,991 (registered Dec. 18, 1984); 2,287,468 (registered Oct. 19, 1999); 1,506,869 (registered Oct. 4, 1988); 3,762,013 (registered Mar. 23, 2010); 6,939,844 (registered Jan. 3, 2023); and 3,545,991 (registered Dec. 16, 2008). Britannica is also the owner of the federally registered trademark in its thistle logo, with Registration No. 7,482,072 (registered Aug. 20, 2024):



42.    Merriam-Webster owns the copyright in the print volume of the Merriam-Webster Collegiate Dictionary (11th ed.). The registration certificate is attached as Exhibit 15 to this complaint.

43.    Merriam-Webster is the owner of several federally registered trademarks for the name "Merriam-Webster," "Merriam-Webster's," and "Merriam-Webster's Collegiate," stylized in different manners, including Registration Nos. 4,382,837 (registered Aug. 13, 2013); 7,551,078 (registered Oct. 29, 2024); 4,763,361 (registered Jun. 30, 2015); 1,762,800 (registered Apr. 6, 1993); 4,763,362 (registered Jun. 30, 2015); 1,826,345 (registered Mar. 15, 1994); and 1,826,344 (registered Mar. 15, 1994).

44.    Certain digital publishers have entered into agreements expected to yield significant revenue through the licensing of their copyrighted articles to AI companies that seek to compensate

17

publishers for their high-quality content.[19] Revenue received from these deals supports the cost of

content creation. In fact, Perplexity itself has entered into licensing agreements with certain

publishers,[20] thus admitting that there is a market for the publishers' content and that lawful use of

such content for its AI technology should come with fair remuneration. Meanwhile Perplexity

continues to copy Plaintiffs' valuable content both as input to its AI model and as output to user

queries without permission or compensation.

## II.    Perplexity's Business, Generative AI Technology, and "RAG" Model

45.    Perplexity is a generative AI company. Backed by investors like Jeff Bezos,

Perplexity was valued at $20 billion in its latest funding round and has said that it currently delivers

more than 100 million generative search results each week.[21] As recently as June 24, 2025, news

---

[19] *See, e.g.*, Tong, A., Wang, E., & Coulter, M., *Exclusive: Reddit in AI content licensing deal with Google*, REUTERS (Feb. 21, 2024), https://www.reuters.com/technology/reddit-ai-content-licensing-deal-with-google-sources-say-2024-02-22/; Rynbaum, M. & Metz, C., *The Times and Amazon Announce an A.I. Licensing Deal*, N.Y. Times (May 29, 2025), https://www.nytimes.com/2025/05/29/business/media/new-york-times-amazon-ai-licensing.html; John Wiley & Sons, Inc., *Wiley Announces Collaboration With Amazon Web Services (AWS) to Integrate Scientific Content Into Life Sciences AI Agents* (May 5, 2025), https://newsroom.wiley.com/press-releases/press-release-details/2025/Wiley-Announces-Collaboration-With-Amazon-Web-Services-AWS-to-Integrate-Scientific-Content-Into-Life-Sciences-AI-Agents/default.aspx; Milliot, J., *Wiley Creates AI Partnership Program*, Publishers Weekly (Oct. 17, 2024), https://www.publishersweekly.com/pw/by-topic/industry-news/industry-deals/article/96248-wiley-creates-ai-partnership-program.html; Milliot, J., *Wiley Wraps Up Divesture Program, Looks at AI Opportunities*, Publishers Weekly (Sept. 5, 2024), https://www.publishersweekly.com/pw/by-topic/industry-news/financial-reporting/article/95870-wiley-wraps-up-divestiture-program-looks-at-ai-opportunities.html.

[20] *See* Harmon, G., *OpenAI, Perplexity secure more publisher licensing deals,* EMARKETER (Dec. 5, 2024), https://www.emarketer.com/content/openai--perplexity-secure-more-publisher-licensing-deals; *U.S. v. Google*, Case No. 20-cv-03010 (D.D.C.), Dkt. 1327 at 13-14, n.13 (representing that Perplexity entered into licensing agreements with Time, Der Spiegel, The Los Angeles Times, Fortune, Entrepreneur, The Texas Tribune, and Automattic); John Wiley & Sons, Inc., *Wiley and Perplexity Announce New AI Search Partnership* (May 8, 2025), https://newsroom.wiley.com/press-releases/press-release-details/2025/Wiley-and-Perplexity-Announce-New-AI-Search-Partnership/default.aspx.

[21] Rebecca Torrence, Charles Rollet, and Ben Bergman, *AI startup Perplexity is raising more money at a $20 billion valuation*, Business Insider (Aug. 13, 2025), https://www.businessinsider.com/perplexity-valuation-jumps-to-20-billion-in-latest-fundraise-2025-8; Wiggers, K., *Perplexity says it's now serving 100M search queries a week*, TechCrunch (Oct. 25, 2024), https://techcrunch.com/2024/10/25/perplexity-says-its-now-serving-100m-search-queries-a-week/.

outlets reported that technology giants like Meta and Apple have been considering Perplexity as a potential target for acquisition.[22]

46.    The LLMs upon which Perplexity's AI products are built are called "generative" AI because they are capable of generating content, such as text, images, audio, or other data, rather than simply analyzing existing data. An LLM works by predicting words that are likely to follow a given string of text based on the potentially billions of examples used to train it. They use algorithms to weigh the relevance of different parts of the input data when generating text. LLM operators "train" their models on vast datasets of written material, allowing them to encode patterns and relationships between words and sentences.

47.    Once trained, LLMs can generate human-like text by taking a seed input (e.g., a question or prompt) and iteratively predicting the most likely next word based on the patterns it has learned. Through this process, LLMs can generate answers to questions about information that is included in their training data. They are also capable of taking documents as input, then summarizing or answering questions about those documents. The quality of the output depends on the size of the model, the diversity of training data, and the specific architecture and training techniques used.

48.    Perplexity has publicly stated that, in addition to creating its own LLMs,[23] it has leveraged the LLMs of other companies, including those of OpenAI and Anthropic,[24] to build its AI products.

---

[22] *See, e.g.*, Lisa Eadicicco, *What is Perplexity, the AI startup said to be catching Meta and Apple's attention*, CNN (June 24, 2025), https://www.cnn.com/2025/06/24/tech/perplexity-ai-search-engine-meta-apple.

[23]    Perplexity, *Introducing PPLX Online LLMs* (Nov. 29, 2023), https://www.perplexity.ai/hub/blog/introducing-pplx-online-llms.

[24] Perplexity, *What is Perplexity?*, https://www.perplexity.ai/help-center/en/articles/10352155-what-is-perplexity (last accessed September 9, 2025).

49.    Once trained, LLMs may also be deployed in conjunction with a technique called "retrieval-augmented generation" ("RAG"). RAG, also known as "grounding," refers to a technique or process that involves connecting an LLM to external sources of information, such as live search results, to improve the quality of its outputs. Using this method, Perplexity's AI products: (1) receive a prompt from a user, such as a question; (2) obtain and copy content from its search index relating to the prompt; (3) combine the original prompt with the retrieved copied content in order to provide additional context; and (4) provide the combined data to an LLM, which generates a natural-language response.

50.    The assembling of content for RAG ("RAG Content") is a distinct process from assembling content to train LLMs. RAG Content is specifically comprised of content that AI companies like Perplexity want to use as source material from which to generate the "answers" to user prompts and questions. As Perplexity itself explains, RAG "merg[es] traditional language models with advanced search capabilities to enhance the accuracy and relevance of generated responses."[25] RAG "enhances the capabilities of large language models (LLMs) by dynamically incorporating external data into the response generation process. This approach allows LLMs to access the most current and relevant information, significantly improving the accuracy and reliability of their outputs."[26] Perplexity chooses only high-quality sources as RAG Content to "compile[] the most relevant insights into a coherent, easy-to-understand answer."[27]

51.    Perplexity's founder and CEO Aravind Srinivas has also described RAG as a separate process from the LLM: "I don't remember off the top of my head what is the exact

---

[25] Perplexity, *An Introduction to RAG Models* (Nov. 18, 2024), https://www.perplexity.ai/page/an-introduction-to-rag-models-jBULt6_mSB2yAV8b17WLDA.

[26] *Id.*

[27] Perplexity, *How does Perplexity work?*, https://www.perplexity.ai/help-center/en/articles/10352895-how-does-perplexity-work (last accessed September 9, 2025).

periodicity, but it's pretty frequent, like at least [] every few hours. It is using retrieval augmented generation. So the necessary elements for this are like good embeddings and like good logic around like rescraping and things like that ***and that is separate from actually the LLM***."[28]

52.    On information and belief, since it was launched in 2022, Perplexity included all of Plaintiffs' copyrighted content as RAG Content, including Plaintiffs' content covered by the registrations listed above. Upon information and belief, Perplexity included Plaintiffs' copyrighted content in its RAG Content including by scraping content from Plaintiffs' websites.

53.    Perplexity has emphasized RAG—and its reliance on high-quality, meticulously researched, and trusted content like that of Plaintiffs—to distinguish itself from other search engines and AI products on the market. Srinivas has described that Perplexity's users like using Perplexity for research and that Perplexity is not really competing with Google but rather "opening a new segment . . . that support people to come do their research directly."[29] In fact, Perplexity has built a "trust map of the web" in which "sites like The New York Times are generally more reliable than Substack posts, which may be more opinionated."[30] And "essentially, because of Perplexity, fact-checking can be made as a software service now."[31]

---

[28] Outset Capital, *Perplexity CEO Aravind Srinivas, Thursday Nights in AI* (July 18, 2023), https://www.youtube.com/watch?v=jksGQhMtXjo at 24:58-25:20 (emphasis added).

[29] *Id.* at 29:49 ("We found like a lot of users like using it for research. . . . Lots of these questions that you have in your day to day life that involve you to like do some amount of research, whether it's a few minutes, a few hours, our product just nails it and that's where we have found a lot of usage, and hence why I think it's not really like a Google competition, even though [it] is very easy to say that. It's more like opening a new segment for these answer bots that support people to come do their research directly.").

[30] Joanne Chen, *How Perplexity.ai Is Pioneering The Future Of Search*, Forbes (Sept. 6, 2023), https://www.forbes.com/sites/joannechen/2023/09/06/how-perplexityai-is-pioneering-the-future-of-search/

[31] Harvard Business School, *Perplexity CEO Aravind Srinivas: From Academic to $9B AI Pioneer | HBS Entrepreneurship Summit 2025* (Apr. 25, 2025), https://www.youtube.com/watch?v=Rkizxztabt8, at 31:42.

54.     The very reason that Perplexity can market itself as a superior research tool compared to other search engines and AI products is its prioritization of RAG, and its principle that "[g]iven a query, always retrieve relevant documents and pick relevant paragraphs from each document and use those documents and paragraphs to write your answer for that query."[32] If anything, Perplexity has taken the concept of RAG and made it even more rigorous: "The principle in Perplexity is you're not supposed to say anything that you don't retrieve, which is even more powerful than RAG because RAG just says, 'Okay, use this additional context and write an answer.' But we say, 'Don't use anything more than that too.' That way we ensure a factual grounding."[33]

55.     Srinivas has stressed the importance of RAG not only to Perplexity but also to the future of generative AI generally. According to Srinivas, RAG is the framework that can train AI to have the context to a user query. Responding to a question about the most promising frontier where the next breakthrough in generative AI may come, Srinivas directly referenced RAG and the importance of context in conversations:

> I think the real breakthrough could potentially come from figuring out extremely long context. *So currently, all the AIs are doing something called the retrieval-augmented generation, including Perplexity. It's called RAG, where the model itself doesn't have the full context to answer your question. And so it pulls the relevant context from some data store, be it the web index or some other data index, and puts it into the prompt, and then answers your question*. But your life—let's say 10 years of your life—all the context in it cannot be compressed that easily. And what if you wanted to chat with an AI in the same way you would chat with a friend that you've known for a decade, where you don't have to keep starting new chats to talk about different things? It's all one single stream of chat. I think that's very hard to do right now. And so figuring out extremely long contexts, like

---

[32] Lex Fridman, *Aravind Srinivas: Perplexity CEO on Future of AI, Search & the Internet | Lex Fridman Podcast #434* (June 19, 2024), https://www.youtube.com/watch?v=e-gwvmhyU7A, at 01:56:48.

[33] *Id.*

one million or 10 million tokens or even infinite tokens—with, What is the right structure to store all the memories?—is still an open problem.[34]

56.     What powers Perplexity's principle of "not saying anything that it doesn't retrieve" is the high-quality content like that of Plaintiffs to feed its RAG model. At bottom, it is the human talent and financial investment that Plaintiffs pour into their content that Perplexity can take for free to train and market its AI product. Srinivas's interview with interviewer Lex Fridman is telling in this regard:

> Fridman: Yeah, let's just linger on that. So in general, RAG is doing the search part with a query to add extra context to generate a better answer?
>
> Srinivas: Yeah.
>
> Fridman: I suppose you're saying **you want to really stick to the truth that is represented by the human-written text on the internet**?
>
> Srinivas: **Correct**.[35]

57.     RAG—whether called retrieval-augmented generation, grounding, retrieving, or contextualizing—is not possible without high-quality, fact-checked content like that of Plaintiffs. Human beings research, write, edit, and *create* this content that Perplexity is taking without compensation. Indeed, Perplexity expressly depends on, and engages in massive copying of, this content to distinguish itself in the marketplace. While benefiting from content including that of Plaintiffs, Perplexity has failed to pay for it, instead brazenly choosing to copy it and trample on human authors' intellectual property in the process.

---

[34] Harvard Business School, *supra* note 31, at 38:05-39:10 (emphasis added).

[35] Fridman, *supra* note 32, at 01:57:27-01:57:39 (emphasis added).

III.    **Perplexity Continues to Infringe Copyrighted Works and Trademarks, Undeterred by Significant Public Criticism of Its Misconduct.**

58.    In addition to the lawsuit from Dow Jones, the publisher of the *Wall Street Journal* and the *New York Post*, accusing it of digital piracy, Perplexity has been under significant public scrutiny for stealing copyrighted works and acting "amoral[ly]" in a quest to acquire users.[36] In particular, both the *New York Times* and BBC have threatened legal action against Perplexity,[37] and countless other publications have sounded the alarm on how Perplexity has used the copyrighted works of content creators without compensation.[38]

---

[36] Randall Lane, *Why Perplexity's Cynical Theft Represents Everything That Could Go Wrong With AI* (June 11, 2024), https://www.forbes.com/sites/randalllane/2024/06/11/why-perplexitys-cynical-theft-represents-everything-that-could-go-wrong-with-ai/ ("AI is only as good as the people overseeing it. I'm an AI bull, and in the right hands, productivity and advances and prosperity await. But in the hands of the likes of Srinivas — who has the reputation as being great at the PhD tech stuff and less-than-great at the basic human stuff — ***amorality poses existential risk***." (emphasis added)).

[37] Reuters, *NYT sends AI startup Perplexity 'cease and desist' notice over content use* (Oct. 16, 2024), https://www.reuters.com/technology/artificial-intelligence/nyt-sends-ai-startup-perplexity-cease-desist-notice-over-content-use-wsj-reports-2024-10-15/; Reuters, *BBC threatens legal action against AI startup Perplexity over content scraping, FT reports* (June 20, 2025), https://www.reuters.com/business/media-telecom/bbc-threatens-legal-action-against-ai-start-up-perplexity-over-content-scraping-2025-06-20/.

[38] *See, e.g.*, Verge Staff, *Perplexity AI: the answer engine with a lot of question marks*, The Verge (Updated Aug. 4, 2025), https://www.theverge.com/24187792/perplexity-ai-news-updates (describing Perplexity as "embroiled in scandal following accusations that it rips off content, doesn't respect robots.txt files, and even plagiarizes articles"); Madhumita Murgia and Cristina Criddle, *Perplexity's popularity surges as AI search start-up takes on Google*, Financial Times (Aug. 8, 2024), https://www.ft.com/content/87af3340-2611-4650-9ae3-036927e9f65c (reporting on "controversy over the start-up's data-gathering techniques"); Elizabeth Lopatto, *Perplexity's grand theft AI*, The Verge (June 27, 2024), https://www.theverge.com/2024/6/27/24187405/perplexity-ai-twitter-lie-plagiarism (describing "Perplexity [a]s basically a rent-seeking middleman on high-quality sources" and outlining options that Srinivas could have taken "[i]f Srinivas wanted to be ethical"); Casey Newton, *How to stop Perplexity and save the web from bad AI*, Platformer (June 20, 2024), https://www.platformer.news/how-to-stop-perplexity-oreilly-ai-publishing/ (describing Perplexity as a "plagiarism engine"); Dhruv Mehrotra and Tim Marchman, *Perplexity Is a Bullshit Machine*, Wired (June 19, 2024), https://www.wired.com/story/perplexity-is-a-bullshit-machine/ (describing how Perplexity "is surreptitiously scraping—and making things up out of thin air"); Alex Ivanovs, *Perplexity has a plagiarism problem*, Stackdiary (June 13, 2024), https://stackdiary.com/perplexity-has-a-plagiarism-problem/ (stating that "'rough edges' aren't exactly a valid argument when your entire product is based on plagiarism, ***not only for written content and reporting but also for images***" (emphasis added)).

24

A.      **Perplexity Infringes Plaintiffs' Copyrights at the *Data Curation* Stage**

59.     Despite public protest, Perplexity continues to infringe Plaintiffs' copyrighted works at the data curation stage when it uses a software called "PerplexityBot" to crawl and scrape Plaintiffs' websites for Perplexity's so-called "answer engine."

60.      Perplexity stresses that the PerplexityBot is "designed to surface and link websites in search results on Perplexity" and is "not used to crawl content for AI foundation models."[39] Notwithstanding the vague representation that the crawler is not used for "AI foundation models," Perplexity specifically designs and uses PerplexityBot to index search results that allows it to answer user queries.

61.     In fact, upon information and belief, data curation is an essential step that powers Perplexity's RAG model. One commentator has noted: "Data curation is an essential process that involves organizing, integrating, and maintaining data for efficient retrieval and analysis. This process becomes even more crucial when dealing with RAG AI systems. Without proper curation, the vast reserves of data become akin to a library where the books are strewn all over the place, making it nearly impossible for the LLM to find what you need."[40]

62.     As discussed above, Perplexity has emphasized RAG to distinguish itself from other search engines and AI products on the market. Data curation—and the massive copyright infringement that Perplexity's software like the PerplexityBot necessarily undertakes for that curation—is crucial in priming Perplexity's RAG model.

---

[39] Perplexity, *Perplexity Crawlers*, https://docs.perplexity.ai/guides/bots (last accessed September 9, 2025).

[40] Will Hawkins, *What Is Data Curation & Why Is It Important In A RAG AI System* (Jan. 26, 2024), https://www.linkedin.com/pulse/what-data-curation-why-important-rag-ai-system-william-hawkins-lhzwc/.

**B.    Perplexity Also Engages in Massive Illegal Copying of Plaintiffs' Original Works as *Inputs* for Its RAG Model**

63.    Perplexity has also continued with its unlicensed and illegal copying of Plaintiffs' copyrighted works as inputs into its RAG model.

64.    Without employing researchers, writers, or editors, Perplexity still boasts that its "content is sourced from the web in real-time as you ask your questions, ensuring you receive the most up-to-date information available."[41] Perplexity further highlights its "credible sources," emphasizing that "all responses are supported by citations from reputable news organizations, academic publications, and ***established content sources***."[42]

65.    Upon information and belief, Perplexity has copied hundreds of thousands of Plaintiffs' copyrighted articles for its RAG database without authorization, the true extent of which is a fact uniquely in the possession of Perplexity.

66.    Upon information and belief, Perplexity copies Plaintiffs' copyrighted works from Plaintiffs' own websites by crawling and scraping them with crawlers, both Perplexity's own crawlers like PerplexityBot and those of third parties on which Perplexity relies.[43] In doing so, Perplexity and/or its agents at times have ignored or evaded technological features, such as robots.txt, designed specifically to ***guard against*** such crawling and to instruct web crawlers to ***refrain from*** copying digital content. Indeed, *WIRED* has reported how "[i]n theory, Perplexity's chatbot shouldn't be able to summarize WIRED articles, because our engineers have blocked its

---

[41] Perplexity, *What is Perplexity?*, *supra* note 24.

[42] *Id.* (emphasis added).

[43] Mark Sullivan, *Perplexity CEO Aravind Srinivas responds to plagiarism and infringement accusations*, Fast Company (June 21, 2024), https://www.fastcompany.com/91144894/perplexity-ai-ceo-aravind-srinivas-on-plagiarism-accusations (deflecting blame that Perplexity's crawlers don't respect robots.txt protocol by saying Perplexity relies on crawlers of unidentified "third-party provider of web crawling and indexing services").

26

crawler via our robots.txt file," and "Perplexity claims to respect the robots.txt standard."[44] "WIRED's analysis found that in practice, though, prompting the chatbot with the headline of a WIRED article or a question based on one will usually produce a summary appearing to recapitulate the article in detail."[45]

67.    An independent developer, Robb Knight, has further reported his investigation and findings that "Perplexity had apparently ignored his robots.txt file and evaded his firewall."[46] Upon information and belief, Perplexity uses "an automated web browser running on a server with an IP address that the company does not publicly disclose."[47] The lack of disclosure means that websites like Britannica.com and Merriam-webster.com cannot block the Perplexity crawlers' IP ranges from scraping their websites. WIRED reports that Conde Nast engineers' analysis of its system logs shows that Perplexity's undisclosed IP address "likely . . . has accessed the company's content thousands of times without permission."[48]

68.    Most recently, four independent investigators reported that they "are observing stealth crawling behavior from Perplexity," after they conducted testing upon receiving complaints from customers who specifically blocked Perplexity's declared crawlers but found that "Perplexity was still able to access their content even when they saw its bots successfully blocked."[49] They found that even when websites explicitly prohibit Perplexity from automated access to their

---

[44] Mehrotra and Marchman, *supra* note 38.

[45] *Id.*

[46] *Id.*; *see also* Robb Knight, *Perplexity AI Is Lying about Their User Agent* (June 19, 2024), https://rknight.me/blog/perplexity-ai-is-lying-about-its-user-agent/.

[47] Mehrotra and Marchman, *supra* note 38; Knight, *supra* note 46.

[48] Mehrotra and Marchman, *supra* note 38.

[49] Gabriel Corral, Vaibhav Singhal, Brian Mitchell & Reid Tatoris, "Perplexity is using stealth, undeclared crawlers to evade website no-crawl directives," Cloudflare (Aug. 4, 2025), https://blog.cloudflare.com/perplexity-is-using-stealth-undeclared-crawlers-to-evade-website-no-crawl-directives/.

content via robots.txt and other Web Application Firewall rules, Perplexity nonetheless scraped their detailed content by using undeclared user agents "intended to impersonate Google Chrome on macOS when their declared crawler was blocked."[50] Perplexity's crawler "utilized multiple IPs not listed in Perplexity's official IP range" in order to "evade website blocks."[51]

69.     Notably, not all generative AI companies behave the way that Perplexity does. This same reporting highlights OpenAI as "an example of a leading AI company that follows [] best practices" that demonstrates how "well-intentioned crawlers acting in good faith" behave.[52] Perplexity has deliberately chosen not to follow best practices and instead deploy "undeclared" and "stealth" crawlers to scrape content expressly against online publishers' wishes and undeterred by their attempts to block Perplexity from doing so.

70.     Upon information and belief, Perplexity has used similar undisclosed methods to access Plaintiffs' content at least thousands of times without permission. Perplexity's access of Plaintiffs' content directly violates Britannica's terms of use.[53] The terms prohibit in no uncertain terms: "You may not use data mining, robots, screen scraping, or similar data gathering and extraction tools on the Services, **such as artificial intelligence ("AI") for purposes of developing or training AI or conducting computer analysis**, except with our express written consent."[54] The terms reiterate that "[i]f you want to reproduce or use content for any purpose or in any manner other than as described above, including **for purposes of developing or training AI or to conduct**

---

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] Enyclopaedia Britannica, *Encyclopaedia Britannica, Inc. Terms of Use* (last updated Feb. 8, 2024), https://corporate.britannica.com/termsofuse.html.

[54] *Id.* (emphasis in original).

**computer analysis**, you will need Britannica's permission" and provides a form through which to direct such requests.[55]

71.    As discussed above, Perplexity stresses the importance of RAG in marketing itself as a superior research tool. This RAG processing requires wholesale copying entirely distinct from the copying of LLMs for training purposes. The input of Plaintiffs' copyrighted content into Perplexity's RAG model constitutes real-time copying of Plaintiffs' content.

### C.    Perplexity's *Outputs* Independently Constitute Infringement of Plaintiffs' Copyrighted Works

72.    Perplexity  infringes on Plaintiffs' copyrighted works in another way: Perplexity's outputs, or answers, to user queries constitute distinct copyright violations independent from the inputs into its RAG model as discussed above.

73.    Perplexity's answers sometimes contain full or partial verbatim reproductions of Plaintiffs' copyrighted articles. At other times, Perplexity's answers are reworded into text that resembles, paraphrases, or summarizes Plaintiffs' copyrighted works.

74.    Upon information and belief, in each of these cases, Perplexity's output answers are designed to, and do, act as substitutes for users clicking on links and otherwise going to Plaintiffs' own websites to read Plaintiffs' copyrighted work, thus diverting revenue away from Plaintiffs to Perplexity.

75.    For example, when a user asked Perplexity, "How does Merriam Webster define plagiarize," Perplexity spit back the exact definition of the term from Merriam Webster, which is identical to the definition in  the print Merriam-Webster Collegiate Dictionary. That print dictionary is registered with the U.S. Copyright Office as part of Registration No. TX0006320515:

---

[55] *Id.* (emphasis in original).

**Perplexity's Answer to the Question, "How does Merriam Webster define plagiarize?"**



**Merriam-Webster's Definition of Plagiarize**



76.    As another example, in the output shown below, Perplexity generates a reproduction of a significant portion of the text of one of Britannica's copyrighted articles. When a Perplexity user asked it what Britannica says about the Druids and to limit its answer to

"Britannica content only," Perplexity's answer provided a near verbatim reproduction of Britannica's article, "Druid,"[56] differing only slightly in language while maintaining the same content. Then, when the user asked Perplexity to "provide the exact passages from the Britannica article," Perplexity reproduced verbatim significant portions of Britannica's article. (While Perplexity did indeed reproduce exact paragraphs from the Britannica article, it also mysteriously left out certain others in the reproduction. This omission supports Plaintiffs' claim that Perplexity has violated the Lanham Act.) Britannica's online article on Druids is registered with the U.S. Copyright Office as part of Registration No. Txu 2-503-561. Perplexity's output and Britannica's copyrighted article are shown in the images below.

[Perplexity's output image on next page]

---

[56] Britannica, *Druid*, https://www.britannica.com/topic/Druid (last accessed September 9, 2025).

**Perplexity provides a user first with a near-verbatim reproduction of a Britannica article, then with what it deems "exact passages" from the article**



## What does Britannica say about the Druids? Please limit your answer to Britannica content only.

Britannica describes the Druids as members of the learned class among the ancient Celts who acted as priests, teachers, and judges. The earliest records date from the 3rd century BCE, and their name might derive from a Celtic word meaning "knower of the oak tree." Julius Caesar, a principal source on the Druids, wrote that they conducted public and private sacrifices, judged disputes, and decreed penalties, with exile from sacrifice being the gravest punishment. Druids abstained from warfare and paid no tribute, attracting many to join them. They studied ancient verse, natural philosophy, astronomy, and religious lore, sometimes training for up to 20 years. They believed in the soul's immortality and reincarnation.

Roman sources also allege that Druids performed human sacrifices, sometimes burning large wicker figures filled with living people. Druids held assemblies annually in a sacred place in Gaul to discuss legal matters and elect their chief. Their rites were initially in forest clearings, with temples appearing under Roman influence later. The Romans suppressed the Druids by decree starting under Tiberius. In Ireland, Druids lost priestly roles after Christianity arrived but survived as poets, historians, and judges. Some scholars view Druids as an Indo-European priesthood parallel to Hindu Brahmans.

Druidic interest revived notably in the 19th century, inspiring modern movements claiming Druidic beliefs in Britain and the United States. [1] [2] [3]



## Please provide the exact passages from the Britannica article

Here are exact passages from the Britannica article on Druids:

"Druid, member of the learned class among the ancient Celts. They acted as priests, teachers, and judges. The earliest records of Druids date from the 3rd century BCE. Caesar also recorded that the Druids abstained from warfare and paid no tribute. Attracted by those privileges, many joined the order voluntarily or were sent by their families. They studied ancient verse, natural philosophy, astronomy, and the lore of the gods, some spending as much as 20 years in training. The Druids were said to believe that the soul was immortal and passed at death from one person into another.

Roman writers also stated that the Druids offered human sacrifices for those who were gravely sick or in danger of death in battle. Huge wickerwork images were filled with living men and then burned; although the Druids preferred to sacrifice criminals, they would choose innocent victims if necessary.

Caesar is the chief authority, but he may have received some of his facts from the Stoic philosopher Poseidonius, whose account is often confirmed by early medieval Irish sagas. Caesar's description of the annual assembly of the Druids and their election of an arch-Druid is also confirmed by an Irish saga.

In the early period, Druidic rites were held in clearings in the forest. Sacred buildings were used only later under Roman influence. The Druids were suppressed in Gaul by the Romans under Tiberius (reigned 14–37 ce) and probably in Britain a little later. In Ireland they lost their priestly functions after the coming of Christianity and survived as poets, historians, and judges (filid, senchaidi, and brithemain). Many scholars believe that the Hindu Brahman in the East and the Celtic Druid in the West were lateral survivals of an ancient Indo-European priesthood.

Interest in Druids surged occasionally in later time, notably during the Romantic period in the 19th century. From then on various movements claiming Druidic beliefs flourished in Britain and in the United States."

—The Editors of Encyclopaedia Britannica [11] [12]


[Britannica's copyrighted article image on next page]

**Britannica's original copyrighted work**

*(The blue box indicates the only paragraph that Perplexity omitted from its reproduction of this article.)*



Roman writers also stated that the Druids offered human sacrifices for those who were gravely sick or in danger of death in battle. Huge wickerwork images were filled with living men and then burned; although the Druids preferred to sacrifice criminals, they would choose innocent victims if necessary.





**woodcut depicting Druid human sacrifice** Woodcut from 1832 depicting Druids preparing a wickerwork filled ι...(more)

Caesar is the chief authority, but he may have received some of his facts from the Stoic philosopher Poseidonius, whose account is often confirmed by early medieval Irish sagas. Caesar's description of the annual assembly of the Druids and their election of an arch-Druid is also confirmed by an Irish saga.

In the early period, Druidic rites were held in clearings in the forest. Sacred buildings were used only later under Roman influence. The Druids were suppressed in Gaul by the Romans under Tiberius (reigned 14–37 CE) and probably in Britain a little later. In Ireland they lost their priestly functions after the coming of Christianity and survived as poets, historians, and judges (*filid*, *senchaidi*, and *brithemain*). Many scholars believe that the Hindu Brahman in the East and the Celtic Druid in the West were lateral survivals of an ancient Indo-European priesthood.

Interest in Druids surged occasionally in later time, notably during the Romantic period in the 19th century. From then on various movements claiming Druidic beliefs flourished in Britain and in the United States.



**Roman soldiers attacking Druids** Roman soldiers attacking Druids in the 1st century CE, 19th-century engraving.



**Access for the whole family!**
Bundle Britannica Premium and Kids for the ultimate resource destination.    Subscribe

*The Editors of Encyclopaedia Britannica*

77.     As yet another example, in the output shown below, a user first asked Perplexity to "provide me with Britannica's article on Quantum Physics." Perplexity's answer synthesized the content of Britannica's article, "Physics,"[57] maintaining as much of the substance of the article as it could in its shorter format. Then, when the user asked Perplexity to "provide the exact passages from this article," Perplexity reproduced verbatim the "Quantum mechanics" and "Fundamental forces and fields" sections of the Britannica article. (While Perplexity did indeed reproduce exact paragraphs from the "Quantum mechanics" and "Fundamental forces and fields" sections, it also mysteriously left out numerous others—namely paragraphs corresponding to the intervening sections on "Relativistic mechanics" and "Conservation laws and symmetry"—in the reproduction. This omission supports Plaintiffs' claim that Perplexity has violated the Lanham Act.) Britannica's online article is registered with the U.S. Copyright Office as part of Registration No. TXu 2-503-567. Perplexity's output is shown in the images below. Britannica's copyrighted article is appended as Exhibit 16 to this complaint.

[Perplexity's output image on next page]

---

[57] Britannica, *Physics*, https://www.britannica.com/science/physics-science (last accessed September 9, 2025).

**Perplexity provides a user with what it deems "exact passages" from a Britannica article**

*(The blue boxes indicate the sections of Perplexity's reproduction in which it omitted numerous paragraphs from Britannica's article.)*



# Please provide me with Britannica's article on Quantum Physics

The Britannica article on Quantum Physics (quantum mechanics) explains that quantum physics is the branch of physics dealing with the behavior of matter and light at the atomic and subatomic scale. It unfolds the revolutionary concept that certain physical quantities, which are continuous in classical physics, are discrete or quantized in quantum theory. Quantum theory replaces the deterministic character of classical physics with intrinsic uncertainty governed by principles like Heisenberg's uncertainty principle.

Key points include:

- Quantum physics describes electromagnetic radiation not only as waves but also as particle-like photons whose energy is proportional to frequency.
- Electrons and other particles exhibit wave-like properties, described by wave functions like those in the Schrödinger equation, which determine quantized energy states.
- Quantum mechanics explains atomic structure, chemical behavior, and various physical properties of matter by considering electrons as standing wave patterns around nuclei.
- The uncertainty principle states that measuring a particle's position precisely increases uncertainty in its momentum, which introduces fundamental limits to predictability.
- The principle of wave-particle duality states that particles such as electrons exhibit both wave-like and particle-like behavior depending on how they are observed.
- Quantum theory includes quantum electrodynamics (QED), a highly precise theory explaining how electrons behave under electromagnetic forces.
- The theory has proven extremely successful experimentally, explaining phenomena inaccessible to classical physics.

The article also touches on the quantum field theory approach and the four fundamental forces of nature under quantum frameworks.

In essence, quantum physics provides a fundamental framework for understanding the microscopic world, replacing classical physics at the atomic scale with a probabilistic and discrete description.[1] [2] [3]



# Please provide the exact passages from this article

Here are exact passages from the Britannica article titled "Physics - Quantum Mechanics, Particles, Waves":

"Although the various branches of physics differ in their experimental methods and theoretical approaches, certain general principles apply to all of them. The forefront of contemporary advances in physics lies in the submicroscopic regime, whether it be in atomic, nuclear, condensed-matter, plasma, or particle physics, or in quantum optics, or even in the study of stellar structure. All are based upon quantum theory (i.e., quantum mechanics and quantum field theory) and relativity, which together form the theoretical foundations of modern physics. Many physical quantities whose classical counterparts vary continuously over a range of possible values are in quantum theory constrained to have discontinuous, or discrete, values. Furthermore, the intrinsically deterministic character of values in classical physics is replaced in quantum theory by intrinsic uncertainty.

According to quantum theory, electromagnetic radiation does not always consist of continuous waves; instead it must be viewed under some circumstances as a collection of particle-like photons, the energy and momentum of each being directly proportional to its frequency (or inversely proportional to its wavelength, the photons still possessing some wavelike characteristics). Conversely, electrons and other objects that appear as particles in classical physics are endowed by quantum theory with wavelike properties as well, such a particle's quantum wavelength being inversely proportional to its momentum. In both instances, the proportionality constant is the characteristic quantum of action (action being defined as energy × time)—that is to say, Planck's constant divided by 2π, or $\hbar$.... In principle, all of atomic and molecular physics, including the structure of atoms and their dynamics, the periodic table of elements and their chemical behaviour, as well as the spectroscopic, electrical, and other physical properties of atoms, molecules, and condensed matter, can be accounted for by quantum mechanics. Roughly speaking, the electrons in the atom must fit around the nucleus as some sort of standing wave (as given by the Schrödinger equation) analogous to the waves on a plucked violin or guitar string. As the fit determines the wavelength of the quantum wave, it necessarily determines its energy state. Consequently, atomic systems are restricted to certain discrete, or quantized, energies. When an atom undergoes a discontinuous transition, or quantum jump, its energy changes abruptly by a sharply defined amount, and a photon of that energy is emitted when the energy of the atom decreases, or is absorbed in the opposite case.

Although atomic energies can be sharply defined, the positions of the electrons within the atom cannot be, quantum mechanics giving only the probability for the electrons to have certain locations. This is a consequence of the feature that distinguishes quantum theory from all other approaches to physics, the uncertainty principle of the German physicist Werner Heisenberg. This principle holds that measuring a particle's position with increasing precision necessarily increases the uncertainty as to the particle's momentum, and conversely. The ultimate degree of uncertainty is controlled by the magnitude of Planck's constant, which is so small as to have no apparent effects except in the world of microstructures. In the latter case, however, because both a particle's position and its velocity or momentum must be known precisely at some instant

in order to predict its future history, quantum theory precludes such certain prediction and thus escapes determinism.... The complementary wave and particle aspects, or wave–particle duality, of electromagnetic radiation and of material particles furnish another illustration of the uncertainty principle. When an electron exhibits wavelike behaviour, as in the phenomenon of electron diffraction, this excludes its exhibiting particle-like behaviour in the same observation. Similarly, when electromagnetic radiation in the form of photons interacts with matter, as in the Compton effect in which X-ray photons collide with electrons, the result resembles a particle-like collision and the wave nature of electromagnetic radiation is precluded. The principle of complementarity, asserted by the Danish physicist Niels Bohr, who pioneered the theory of atomic structure, states that the physical world presents itself in the form of various complementary pictures, no one of which is by itself complete, all of these pictures being essential for our total understanding. Thus both wave and particle pictures are needed for understanding either the electron or the photon.

Although it deals with probabilities and uncertainties, the quantum theory has been spectacularly successful in explaining otherwise inaccessible atomic phenomena and in thus far meeting every experimental test. Its predictions, especially those of QED, are the most precise and the best checked of any in physics; some of them have been tested and found accurate to better than one part per billion...."

"Fundamental forces and fields

The four basic forces of nature, in order of increasing strength, are thought to be: (1) the gravitational force between particles with mass; (2) the electromagnetic force between particles with charge or magnetism or both; (3) the colour force, or strong force, between quarks; and (4) the weak force by which, for example, quarks can change their type, so that a neutron decays into a proton, an electron, and an antineutrino. The strong force that binds protons and neutrons into nuclei and is responsible for fission, fusion, and other nuclear reactions is in principle derived from the colour force. Nuclear physics is thus related to QCD as chemistry is to atomic physics.

According to quantum field theory, each of the four fundamental interactions is mediated by the exchange of quanta, called vector gauge bosons, which share certain common characteristics. All have an intrinsic spin of one unit, measured in terms of Planck's constant $\hbar$. (Leptons and quarks each have one-half unit of spin.) Gauge theory studies the group of transformations, or Lie group, that leaves the basic physics of a quantum field invariant. Lie groups, which are named for the 19th-century Norwegian mathematician Sophus Lie, possess a special type of symmetry and continuity that made them first useful in the study of differential equations on smooth manifolds (an abstract mathematical space for modeling physical processes). This symmetry was first seen in the equations for electromagnetic potentials, quantities from which electromagnetic fields can be derived. It is possessed in pure form by the eight massless gluons of QCD, but in the electroweak theory—the unified theory of electromagnetic and weak force interactions—gauge symmetry is partially broken, so that only the photon remains massless, with the other gauge bosons ($W^+$, $W^-$, and Z) acquiring large masses. Theoretical physicists continue to seek a further unification of QCD with the electroweak theory and, more ambitiously still, to unify them with a quantum version of gravity in which the force would be transmitted by massless quanta of two units of spin called gravitons."

These passages provide a detailed overview of quantum physics and its foundational principles as presented in Britannica's article. [11]

78.    Even when the user does not prompt Perplexity to limit its answers to Britannica's content, Perplexity often does so. For example, in the output shown below, a user asked Perplexity "what are the top 9 mysterious disappearances of people other than Amelia Earhart." Perplexity provided a near-verbatim reproduction of Britannica's article, "9 Mysterious Disappearances of People Other Than Amelia Earhart."[58] Strikingly, Perplexity identically reproduced the selection and ordering of the listed people in its answer. Britannica's article on the mysterious disappearances of people other than Amelia Earhart is registered with the U.S. Copyright Office as part of Registration No. TXu 2-525-852. Perplexity's output and the table of contents of Britannica's copyrighted article, reflecting the same selection and ordering of the nine people, are shown in the images below.

[Perplexity's output image on next page]

---

[58]    Britannica, *9 Mysterious Disappearances of People Other Than Amelia Earhart*, https://www.britannica.com/list/9-mysterious-disappearances-of-people-other-than-amelia-earhart    (last accessed February __, 2026).

**Perplexity provides a user with an identical list copied from Britannica's copyrighted article**



what are the top 9 mysterious disappearance of people other than Amelia Earhart

According to authoritative sources, nine of the most mysterious disappearances (excluding Amelia Earhart) are:

- **Al-Hakim:** The 11th-century Fatimid caliph vanished during a nighttime ride in Cairo in 1021. No trace was ever found 3 .

- **Edward V of England:** The 12-year-old king and his brother Richard disappeared in the Tower of London in 1483. Their ultimate fate remains unknown, fueling the mystery of the "Princes in the Tower" 3 .

- **The Lost Colony of Roanoke:** In the late 16th century, more than 100 settlers vanished from Roanoke Island. The word "Croatoan" was found carved, but no bodies or clear answers emerged 3 .

- **Solomon Northup:** The real-life subject of "12 Years a Slave" vanished from records after 1857, with no conclusive account of his fate or place of death 3 .

- **Ambrose Bierce:** The American writer and journalist disappeared without a trace in Mexico in 1913 while reporting on the Mexican Revolution 3 .

- **George Mallory:** The famed British mountaineer went missing on Mount Everest in 1924; his body was only found 75 years later, but it remains uncertain whether he reached the summit 3 .

- **Wallace D. Fard:** The founder of the Nation of Islam disappeared in 1934, leaving no definitive clue to his real identity or fate 3 .

- **Raoul Wallenberg:** The Swedish diplomat saved thousands of Jews during WWII. He was arrested by Soviet forces in 1945 and was never seen again, with conflicting reports about his possible fate 3 .

- **Jimmy Hoffa:** The American union leader vanished in 1975 from a Detroit suburb. Despite decades of investigation, no trace has ever been found, and his disappearance remains unsolved 3 ⊙2 .

These cases span centuries and continents, each remaining unsolved and fueling speculation and investigation to this day 3 .

↗ Share    ⬙ Export    ⟳ Rewrite                    👍  👎  📋  ⋯

41

**The table of contents of Britannica's original copyrighted article**



79.     These are merely a few examples of Perplexity generating verbatim or near-verbatim text and identical curation of content (including in selection and prioritization of lists) from Britannica's copyrighted articles. Upon information and belief, there are many others. The examples above reflect just some of the ways that Perplexity copies, uses, and profits from Plaintiffs' works.

**D.**     **Perplexity's Response to Public Criticism of Its Infringing and Unethical Conduct Does Not Justify that Conduct.**

80.     Perplexity has responded to public criticism of its misconduct by alluding to three defenses: cited sources and referral traffic, its Publishers' Program, and principles of fair use. None successfully defends against Perplexity's large-scale copyright infringement.

81.     *First*, Perplexity has publicly emphasized its "Cited Sources" feature and how it is "at least attributing every part of the answer, where are we getting it from in terms of inline citations as well as the source panel at the top."[59] Indeed, Perplexity has pointed to its citation of sources as a key feature and as a market differentiator of its "answer engine."[60]

82.     Srinivas pointed to the "Cited Sources" feature directly in response to criticism that Perplexity, by "reformat[ting] and summariz[ing]," reduces "incentive[s]" for original content creators to "produce high-quality, trustworthy information," for "those original content creators to actually put something verifiable out there."[61] When asked to respond to the previous criticism, Srinivas stated: "So the number one thing is that we ensure that the sources are right there at the top. . . . [Y]ou can literally click on them, and they're very easy to click on."[62]

---

[59] Indian Institute of Technology Madras, Office of Alumni and Corporate Relations, *Talk by Shri. Aravind Srinivas, Founding Story and Journey of Perplexity*, at 49:23-49:42 (Jan. 18, 2024), https://www.youtube.com/watch?v=ygRVDIwheB4.

[60] *See, e.g.*, Outset Capital, *supra* note 28, at 19:27-19:37 (Srinivas: "Like I said, a core tenet of the product is, 'only say what you can cite.' That's also a principle in academic or journalism, like you need to have sources.").

[61] Harvard Business School, *supra* note 31, at 26:08-26:40.

[62] *Id.* at 26:37-27:02; *see also* News Release, *CNBC Exclusive: CNBC Transcript: Perplexity Founder & CEO Aravind Srinivas Speaks with CNBC's Andrew Ross Sorkin on "Squawk Box" Today*, CNBC (Apr. 23, 2024), https://www.cnbc.com/2024/04/23/cnbc-exclusive-cnbc-transcript-perplexity-founder-ceo-aravind-srinivas-speaks-with-cnbcs-andrew-ross-sorkin-on-squawk-box-today.html (Sorkin: "There is a real question mark about what happens to . . . the actual economy of those who are creating the underlying content that effectively is being scraped. If it all goes back into a system like yours . . . and nobody ultimately is going back to the original source or website, what that does to the system. What do you think about that?" Srinivas: "So Perplexity has been revolutionary in the fact that ever since the first day we launched, we always cite our sources.").

83. Srinivas has also expressly linked Perplexity's "Cited Sources" feature to a purported increase in referral traffic from Perplexity to original content creators. In response to a question by interviewer Andrew Ross Sorkin on Perplexity's impact on the economy of original content creators, Srinivas claimed that Perplexity's "Cited Sources" feature has "people clicking on the links, and a lot of people praise us and, like, even are noticing the referral traffic from Perplexity."[63] Srinivas did not bother specifying exactly who is praising Perplexity. Nor did he specify who is noticing referral traffic from Perplexity.

84. Srinivas's unsubstantiated claim is contradicted by Plaintiffs' experience of detecting de minimis click-through traffic on its websites from "cited sources" links on Perplexity, despite Perplexity boasting approximately 22 million active users across its website and app.[64]

85. Upon information and belief, Perplexity's citations make users *less* likely to visit the original content source, because, in Perplexity's own words, citations make content appear more "reliable . . . and saves you the trouble of clicking through endless links."[65] Indeed, Perplexity has marketed its value proposition as "saving [users] time and energy"[66]—which is the opposite effect of users' expending time clicking through Perplexity's cited sources.

86. *Second*, Perplexity has sought to deflect criticism of its widescale copyright infringement by pointing to its "Publishers' Program," announced in the wake of plagiarism accusations.[67] Perplexity has stated that one key component of this Program is "revenue sharing":

---

[63] News Release, *CNBC Exclusive*, *supra* note 62.

[64] Curry, *supra* note 18.

[65] Perplexity, *Getting started with Perplexity*, https://www.perplexity.ai/hub/blog/getting-started-with-perplexity (last accessed September 9, 2025).

[66] *Id.*

[67] Kylie Robison, *Perplexity is cutting checks to publishers following plagiarism accusations*, The Verge (July 30, 2024), https://www.theverge.com/2024/7/30/24208979/perplexity-publishers-program-ad-revenue-sharing-ai-time-fortune-der-spiegel.

"When Perplexity earns revenue from an interaction where a publisher's content is referenced, that publisher will also earn a share."[68] Although Perplexity has been quick to emphasize that other tech companies have not engaged in revenue-sharing,[69] Perplexity has not publicized the specific portion of revenue that it plans to share with content creators.

87.    In May 2025, Perplexity reached out to Plaintiffs to discuss a potential partnership. The parties had an initial phone call on May 9, 2025 during which Perplexity did not provide any material information regarding the requested partnership, financial or otherwise. After the call, Perplexity requested multiple times that the parties negotiate a non-disclosure agreement before engaging in further substantive discussions. Neither Plaintiff ultimately executed a non-disclosure agreement or participated in any partnerships with Perplexity.

88.    While Perplexity correctly concedes that generative AI "hinges on trusted, accurate sources" from the "vital work of media organizations and online creators,"[70] the Publishers' Program is no solution or defense to Perplexity's infringement. Rather, this Program is Perplexity's naked attempt to retroactively dictate the terms of a license to owners of original content from whom Perplexity has already taken copyrighted material. In the negotiation of a valid license to copyrighted material, an infringer does not unilaterally dictate the terms of the license to its victims.

89.    *Finally*, Perplexity has maintained that their widescale infringement of copyrighted work is justified as a fair use. In July 2024, Tech Crunch reported that Perplexity "maintains that

---

[68]    Perplexity, *Introducing the Perplexity Publishers' Program* (July 30, 2024), https://www.perplexity.ai/hub/blog/introducing-the-perplexity-publishers-program.

[69] Harvard Business School, *supra* note 31, at 27:02-27:20 (Srinivas: "We're also having a publisher program, where we share revenue made on a query with the publishers. And, by the way, this is something Google never did. They make a lot of ad revenue. They tell publishers, we're giving you traffic. But they don't share the ad revenue with the publishers.").

[70] Perplexity, *Introducing the Perplexity Publishers' Program*, *supra* note 68.

it has done nothing wrong. The Nvidia- and Jeff Bezos-backed company says that it has honored publishers' requests to not scrape content and that it is operating within the bounds of fair use copyright laws."[71] Indeed, Perplexity's Chief Business Officer, Dmitry Shevelenko, has commented that the accusation of copyright infringement and plagiarism "isn't quite fair": "There's intricacies of fair use and copyright law where we feel we're kind of, you know, clearly within those bounds."[72]

90.    This tepid fair use defense is also incorrect. Perplexity's use is plainly for a commercial purpose. Upon information and belief, Perplexity copies as RAG Content every single word of Plaintiffs' copyrighted works that it can access, and uses these copies to create a commercial substitute for Plaintiffs' protected works. Such substitution causes substantial harm to Plaintiffs' advertising and subscription revenues.

91.    The U.S. Copyright Office has also released a report on copyright and artificial intelligence. Part 3 of that report focuses on Generative AI Training.[73] In that report, the U.S. Copyright Office concludes that RAG is "less likely to be transformative" and thus not qualify as fair use "where the purpose is to generate outputs that summarize or provide abridged versions of retrieved copyrighted works, such as news articles, as opposed to hyperlinks."[74]

92.    Perplexity's use of Plaintiffs' copyrighted works is not transformative. A transformative work adds something new, with a further purpose or different character, altering

---

[71] Rebecca Bellan, *News outlets are accusing Perplexity of plagiarism and unethical web scraping*, Tech Crunch (July 2, 2024), https://techcrunch.com/2024/07/02/news-outlets-are-accusing-perplexity-of-plagiarism-and-unethical-web-scraping/.

[72] Robison, *supra* note 67.

[73] United States Copyright Office, *Copyright and Artificial Intelligence, Part 3: Generative AI Training (Pre-Publication Version)*, May 2025, https://www.copyright.gov/ai/Copyright-and-Artificial-Intelligence-Part-3-Generative-AI-Training-Report-Pre-Publication-Version.pdf.

[74] *Id.* at 47.

the original with new expression, meaning, or message. Here, all that Perplexity's "answer engine" does is copy the expression, meaning, and message of others and repackage it to the consumer. Perplexity's machine adds no new expression, meaning, or message of its own.

**IV.    Perplexity Engages in Trademark Infringement by Falsely Attributing "Hallucinations" to Plaintiffs and by Misleadingly Omitting Content While Reproducing Britannica's Works.**

93.    Perplexity has touted its lower likelihood to generate made-up text or "hallucinations" compared to other generative AI machines on the market. According to Srinivas, Perplexity's "tenet" of citing sources also contributes to a reduction in hallucinations. When asked how Perplexity "prevent[s] or cut[s] down on hallucinations," Srinivas responded: "The core tenet of the product is, only say what you can cite. That's also a principle in academia or journalism, like you need to have sources. So, if you're only going to pull up content from a link or a webpage, and only use that content for writing the answer, you can reduce hallucinations a lot."[75]

94.    Despite this positive self-evaluation, Perplexity sometimes generates hallucinations in its outputs and attributes that text to Plaintiffs using Plaintiffs' trademarks. Perplexity's use of these marks alongside hallucinations is likely to cause dilution by blurring and/or tarnishing Plaintiffs' famous marks. In addition, Perplexity's use of these marks alongside hallucinations constitutes false designations of origin and confuses and deceives Perplexity users into believing (falsely) that the hallucinations are associated with, sponsored by, or approved by Plaintiffs. This false belief, induced by Perplexity, causes significant harm to Plaintiffs.

95.    Perplexity engages in trademark infringement in a second independent way: It omits content from Britannica's articles that it purports are exact reproductions of such articles. As shown in the above examples regarding Britannica's articles on Druids and Physics, *see supra*

---

[75] Outset Capital, *supra* note 28, at 19:22-19:47.

at ¶¶ 76-77, Perplexity sometimes excludes certain paragraphs from Britannica's articles while verbatim reproducing others. Perplexity does not disclose these omissions, thus falsely giving the impression to Perplexity's user that what Perplexity presents constitutes the complete reproduction of a Britannica article when, in fact, numerous paragraphs are missing throughout. This undisclosed omission by Perplexity causes significant harm to Plaintiffs.

## V.    **Plaintiffs Suffer Harm from Perplexity's Illegal Conduct**

96.    By copying Plaintiffs' copyrighted content and using it to create substitutes for visiting Plaintiffs' websites, Perplexity is misappropriating substantial advertising and subscription revenue opportunities that belong rightfully to Plaintiffs as the creators and owners of the copyrighted works.

97.    Perplexity's latest valuation at $20 billion and success at raising funds of nearly $1.5 billion[76] are indicative of the potentially massive illegal transfer of revenue from original content creators like Plaintiffs to Perplexity.

98.    In addition to this massive misappropriation of revenue, when outputs from Perplexity's machine contain hallucinations attributed to Plaintiffs via their trademarks or undisclosed omissions in reproductions of Plaintiffs' content, Plaintiffs are further harmed by false attributions and dilution. Perplexity's hallucinations, passed off as Plaintiffs' high-quality, meticulously researched, and trusted content (using Plaintiffs' trademarks), damage the value of Plaintiffs' trademarks. Likewise, Perplexity's undisclosed omissions, passed off as the complete versions of Plaintiffs' high-quality, meticulously researched, and trusted content (using Plaintiffs' trademarks), damage the value of Plaintiffs' trademarks. The hallucinations and undisclosed omissions also cause harm to the public.

---

[76] Torrence, Rollet, and Bergman, *supra* note 21.

99.     Upon information and belief, Perplexity is aware, including from its own "Publishers' Program" and its licensing deals with certain publishers,[77] that there is a market for licensing copyrighted works for use in AI outputs. Perplexity has chosen to operate without such licenses and to scrape copyrighted content with impunity even when expressly asked by the copyright owner not to do so. Plaintiffs are directly injured by Perplexity's misuse of Plaintiffs' copyrighted works, which deprives Plaintiffs of immediate and potential advertising and subscription revenues.

100.    Perplexity's conduct also harms the public by eroding the economic incentives necessary for the creation and publication of trustworthy, informative content. In the long term, Plaintiffs and other publishers will not be able to generate high-quality content because they will not receive a sufficient return on investment via advertising and subscription revenues. Less content of poorer quality will further result in reduced revenue, and thus less spending on content creation, spawning even less content of even poorer quality and even less revenue, and so on in a downward spiral for content creators like Plaintiffs. In this way, Perplexity imperils the very market for the high-quality content that it copies and reproduces.

## COUNT I
### Copyright Infringement (17 U.S.C. § 106(1)) – Perplexity's Copying of Plaintiffs' Copyrighted Works to Create "Inputs" for Its RAG Content

101.    Plaintiffs restate and incorporate by reference their allegations as set forth in the preceding paragraphs.

102.    Plaintiffs hold exclusive rights to the extensive body of copyrighted material they seek to protect in this case.

---

[77] *See supra* note 19 and accompanying text.

103.    This includes copyrights registered with the U.S. Copyright Office, including Registration Nos. TXu 2-503-544, TXu 2-503-584, TXu 2-503-589, TXu 2-503-609, TXu 2-503-614, TXu 2-503-573, TXu 2-503-592, TXu 2-503-550, TXu 2-503-567, TXu 2-503-601, TXu 2-503-578, TXu 2-503-561, TX 6-234-118, TXu 2-525-852, and TX0006320515, attached as Exhibits 1-15.

104.    Upon information and belief, Perplexity, without Plaintiffs' authorization, directly or indirectly through a third party, has willfully copied as many of Plaintiffs' articles and content that it has been able to access with its own or with third parties' web crawlers as inputs into database(s) or index(es). These inputs include content covered by the registrations listed at Exhibits 1-15.

105.    This database(s) or index(es) are used for a process commonly referred to as retrieval-augmented generation or "RAG."

106.    The copies that are made as inputs into Perplexity's AI product, which may be retained in Perplexity's RAG database(s) or index(es), are distinct copyright violations on a massive scale.

107.    Perplexity's massive and ongoing infringements violate the Copyright Act, 17 U.S.C. § 106(1).

108.    Perplexity's infringements are ongoing, and Plaintiffs are entitled to injunctive relief and other equitable remedies.

109.    Plaintiffs are also entitled to statutory damages, actual damages, restitution of profits, attorneys' fees, costs of suit, and other remedies provided by law.

## COUNT II
### Copyright Infringement (17 U.S.C. § 106(2)) – Perplexity's Copying of Plaintiffs' Copyrighted Works to Create "Outputs" to User Queries

110. Plaintiffs restate and incorporate by reference their allegations as set forth in the preceding paragraphs.

111. Plaintiffs hold exclusive rights to the extensive body of copyrighted material they seek to protect in this case.

112. This includes copyrights with the U.S. Copyright Office, including Registration Nos. TXu 2-503-544, TXu 2-503-584, TXu 2-503-589, TXu 2-503-609, TXu 2-503-614, TXu 2-503-573, TXu 2-503-592, TXu 2-503-550, TXu 2-503-567, TXu 2-503-601, TXu 2-503-578, TXu 2-503-561, TX 6-234-118, TXu 2-525-852, and TX0006320515, attached as Exhibits 1-15.

113. Upon information and belief, Perplexity, without Plaintiffs' authorization, directly or indirectly through a third party, has willfully copied as many of Plaintiffs' articles and content that it has been able to access with its own or with third parties' web crawlers as inputs into database(s) or index(es), including content covered by the registrations listed at Exhibits 1-15.

114. This database(s) or index(es) are used for a process commonly referred to as retrieval-augmented generation or "RAG."

115. Perplexity, in turn, uses Plaintiffs' copyrighted content, accessed through its RAG process, to produce outputs, or "answers" to user queries.

116. The outputs or "answers" to user queries contain and/or are derived from Plaintiffs' copyrighted content, whether they come in the form of verbatim or near-verbatim reproductions, summaries, or abridgements of Plaintiffs' copyrighted works; copying the unique selection and prioritization of lists and content in Britannica articles; or any other reproduced or derivative content sourced from Plaintiffs' copyrighted works—all of which infringe on Plaintiffs' copyrighted articles.

117. As Perplexity has publicly stated, these outputs are designed to eliminate the need for its users to visit the original content creators' websites.

118. Every instance in which Perplexity, on its own or by directing or controlling a third party, copies Plaintiffs' copyrighted work in the process of generating outputs or "answers," constitutes a separate violation of the Copyright Act, 17 U.S.C. § 106(2).

119. Perplexity's infringements are ongoing, and Plaintiffs are entitled to injunctive relief and other equitable remedies.

120. Plaintiffs are also entitled to statutory damages, actual damages, restitution of profits, attorneys' fees, costs of suit, and other remedies provided by law.

**COUNT III**
**False Designation of Origin and Dilution of Plaintiffs' Trademarks (15 U.S.C. § 1125)**

121. Plaintiffs restate and incorporate by reference their allegations as set forth in the preceding paragraphs.

122. Britannica is the owner of several federally registered trademarks for the name "Britannica," including Registration Nos. 1,309,991 (registered Dec. 18, 1984); 2,287,468 (registered Oct. 19, 1999); 1,506,869 (registered Oct. 4, 1988); 3,762,013 (registered Mar. 23, 2010); 6,939,844 (registered Jan. 3, 2023); and 3,545,991 (registered Dec. 16, 2008). Britannica is also the owner of the federally registered trademark in its thistle logo, with Registration No. 7,482,072 (registered Aug. 20, 2024).

123. Merriam-Webster is the owner of several federally registered trademarks for the name "Merriam-Webster," "Merriam-Webster's," and "Merriam-Webster's Collegiate," stylized in different manners, including Registration Nos. 4,382,837 (registered Aug. 13, 2013); 7,551,078 (registered Oct. 29, 2024); 4,763,361 (registered Jun. 30, 2015); 1,762,800 (registered Apr. 6,

1993); 4,763,362 (registered Jun. 30, 2015); 1,826,345 (registered Mar. 15, 1994); and 1,826,344 (registered Mar. 15, 1994).

124.    Each of these trademarks are distinctive and "famous marks" within the meaning of Section 42(c) of the Lanham Act, are widely recognized by the general consuming public of the United States, and became distinctive and famous prior to Perplexity's unauthorized use.

125.    Each of the trademarks is incontestable as a result of Plaintiffs' registration and continued use of these marks.

126.    When Perplexity's website and app are asked questions that relate to Plaintiffs' publications, the applications will often misrepresent Plaintiffs' work, falsely attributing content to Plaintiffs' trademarked publications and content or misleadingly omitting portions of Plaintiffs' trademarked publications.

127.    Upon information and belief, Perplexity is aware that their applications falsely attribute content to Plaintiffs' trademarked publications and content. Upon information and belief, Perplexity is also aware that their applications misleadingly omit portions of Plaintiffs' publications and falsely suggest that its incomplete reproductions constitute the entirety of Plaintiff's publications.

128.    Perplexity has used and, upon information and belief, continues to use in interstate commerce the "Britannica," "Merriam-Webster," Britannica's thistle logo, and Merriam-Webster's logo marks similar and/or identical to Plaintiffs' well-known and famous trademarks in a misleading manner, falsely attributing content to Plaintiffs' trademarked publications and content.

129.    Perplexity's use of similar and/or identical copies of Plaintiffs' famous, distinctive marks without authorization, in connection with its generative AI applications, creates an

association in the minds of its users that the outputs generated by Perplexity's applications, including hallucinations and undisclosed omissions, are derived from, associated with, and/or complete version of sources of high-quality content. This association, in turn, impairs the distinctiveness of the marks.

130. Perplexity's actions also violate 15 U.S.C. § 1125(c) because they are likely to cause dilution of Plaintiffs' famous and distinctive marks by blurring and/or tarnishment.

131. Perplexity's actions also violate 15 U.S.C. § 1125(a)(1) because they trade upon Plaintiffs' valuable reputation and consumer goodwill by using Plaintiffs' trademarks and/or confusingly similar marks in a manner that causes and/or is likely to cause confusion, mistake, or deception of consumers into believing that Perplexity's outputs are factually correct, complete, and authoritative because they are sourced from, associated with, sponsored by, or approved by Plaintiffs.

132. Upon information and belief, Perplexity has actual knowledge of Plaintiffs' ownership and use of the ""Britannica," "Merriam-Webster," Britannica's thistle logo, and Merriam-Webster's logo trademarks. Perplexity's use of the trademarks without the consent of Plaintiffs constitutes a willful violation of 15 U.S.C. § 1125.

133. Perplexity's infringements are ongoing, and Plaintiffs are entitled to injunctive relief and other equitable remedies.

134. Plaintiffs are also entitled to statutory damages, actual damages, restitution of profits, attorneys' fees, costs of suit, and other remedies provided by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand judgment against Perplexity as follows:

a.   Awarding Plaintiffs statutory damages, actual damages, restitution of profits, and any other relief that may be permitted by law or equity;

b.   Permanently enjoining Perplexity from engaging in the unlawful conduct alleged herein;

c.   Awarding Plaintiffs costs, expenses, and attorneys' fees as permitted by law; and

d.   Awarding Plaintiffs such other or further relief as the Court may deem just.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable in this Complaint.


Dated: March 17, 2026                    /s/ Ian Crosby
                                         Ian Crosby (*pro hac vice*)
                                         SUSMAN GODFREY L.L.P.
                                         401 Union Street, Suite 3000
                                         Seattle, WA 98101
                                         Telephone: (206) 516-3880
                                         Facsimile: (206) 516-3883
                                         icrosby@susmangodfrey.com

                                         Davida Brook (*pro hac vice*)
                                         SUSMAN GODFREY L.L.P.
                                         1900 Avenue of the Stars, Suite 1400
                                         Los Angeles, CA 90067
                                         Telephone: (310) 789-3100
                                         Facsimile: (310) 789-3150
                                         dbrook@susmangodfrey.com

                                         Y. Gloria Park (SDNY No.: GP0913)
                                         Sarah Hannigan (5961248)
                                         SUSMAN GODFREY L.L.P.
                                         One Manhattan West, 50th Floor
                                         New York, NY 10001
                                         Telephone: (212) 336-8330
                                         Facsimile: (212) 336-8340
                                         gpark@susmangodfrey.com
                                         shannigan@susmangodfrey.com

                                         *Attorneys for Plaintiffs*